**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-80186-CIV-RYSKAMP/VITUNAC

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

KL GROUP, LLC., et al.,

      Defendants.

_____/

## ORDER HOLDING JOHN KIM IN CIVIL CONTEMPT

THIS CAUSE comes before the Court pursuant to the Securities and Exchange

Commission ( "SEC") and Receiver's Joint Findings regarding John Kim's Ability to Pay, filed

November 16, 2006 **[DE 254]**.

## I.  BACKGROUND

On June 16, 2006, the SEC and Receiver moved for and Order to Show Cause Why John

Kim Should Not Be Held in Contempt of this Court's March 25, 2005 Preliminary Injunction.

On March 2, 2005, the SEC filed its Complaint, alleging that Kim and others violated the anti-

fraud provisions of the federal securities laws by defrauding investors out of millions of dollars

through a series of affiliated hedge funds known as the "KL Funds."  The complaint alleges that

Kim and others falsely portrayed that the funds were extremely successful, when in reality they

were losing millions of dollars.  On March 3, 2005, the Court granted the SEC's motion for a

temporary restraining order and asset freeze and appointed Guy A. Lewis, Esq. as the Receiver in

this case.  Kim subsequently consented to the entry of a Preliminary Injunction against him,

2

which the Court entered on March 25, 2005.

The Preliminary Injunction provided in pertinent part.

> IT IS FURTHER ORDERED that: pending resolution of this case on the merits, and except as the Court otherwise allows and is Order, Kim, his officers, directors, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them who receive notice of this order by personal service, mail, facsimile transmission or otherwise, except the Receiver this Court appointed and his agents, be and hereby are restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property owned by, controlled by, or in the possession of Kim, including, but not limited to, cash, free credit balances, fully paid for securities, and/or property pledged or hypothecated as collateral for loans.

Preliminary Injunction at 3 (Section II. A).  Second, the Preliminary Injunction required Kim to take steps to transfer property he owned in Korea to the possession of the Receiver:

> Kim shall within 10 days from the date of this Order begin taking steps to transfer property in Seoul, Republic of Korea, identified as Mei Apartment  #301, 124-12, Itaewon-dong, Yongsan-ku, which he purchased for $650,000 in 2005 ("the Korean Property"), to an escrow established by the Court-appointed Receiver.  Kim shall retain title in the Korean Property.  The escrow shall hold the Korean Property and shall transferred title in the Korean Property only upon entry of any permanent injunctions, final judgments, disgorgement orders, or penalty orders that the Court may issue in this litigation against Kim.  Kim shall complete this transfer of the Korean Property to escrow as expeditiously as possible.

Preliminary Injunction at 4-5 (Section II. D).

The Receiver, the SEC and Kim's counsel began working towards the transfer of the

Korean Property, deciding to effectuate a sale in Korea and transfer the cash proceeds to an

escrow account.  As Kim was finalizing the sale of the property, his counsel informed the Receiver and the SEC that, for a variety of reasons, the buyer would not agree to transfer the sale proceeds directly to the Receiver.  Accordingly, the parties agreed that Kim would first transfer the money to a U.S. account under his wife's name, and then to an account the Receiver maintained.  The Receiver would hold those proceeds until the resolution of this matter.

Kim closed the Korean Property sale in January of 2006.  On January 6, 2006, the proceeds, $384,658, were wired to his wife's account.  Kim had access to the account password and learned that the money had arrived in the account.  Kim knew these proceeds were frozen and that he was prohibited from accessing them, yet he told his wife that he was allowed to keep and use the money under the terms of an agreement with the SEC and the Receiver.  Kim persuaded his wife to transfer the money to other accounts.  Kim lost virtually all of the money in futures trading in a little more than a month.

At the time of the entry of the Temporary Restraining Order and the Preliminary Injunction, Kim owned a Porsche 911 that became subject to the asset freeze provisions of those orders.  Due to Kim's apparent initial willingness to cooperate, the SEC and the Receiver agreed to let him keep the Porsche temporarily.  Upon entry of the permanent injunction against Kim on March 2, 2006, however, the Receiver demanded possession of the Porsche.  Kim gave a series of shifting explanations as to the status of the vehicle.  First, he claimed he had lost the title. Then he claimed keys were at an office, then that the car was parked in a public lot in Irvine, California, and finally, that he could not remember where he had parked the car.  The SEC and the Receiver informed Kim that they would move for a contempt order if he did not immediately transfer the car.  Kim had actually sold the car months before.  He claims to have generated

4

$40,000 from the sale, which he says he spent on living expenses for himself and his family.

On May 26, 2006, the SEC received a phone call from Kim and one of his lawyers.  Kim proceeded to admit to selling the Porsche and absconding with the proceeds from the Korean Property sale.  He acknowledged him that he knew both actions violated the Preliminary Injunction.  The Receiver subsequently received a similar phone call.

The SEC and the Receiver deposed Kim on June 6, 2006.  Kim refused to answer virtually all questions on the basis of his Fifth Amendment privilege against self-incrimination.  Two days later, however, Kim submitted a declaration in which he admitted under oath that he knowingly diverted and dissipated frozen assets in violation of the Preliminary Injunction.  On June 16, 2006, the SEC and the Receiver moved for an Order to Show Cause why Kim should not be held in contempt of court for violation of March 25, 2005 Preliminary Injunction.

The Court granted the motion on July 25, 2006, granting Kim ten days to show cause why he should not be held in civil contempt and be incarcerated until he repays the frozen money he took.  Kim responded on August 8, 2006.  Kim did not challenge the validity or clarity of the Preliminary Injunction, nor did he dispute that he violated it.  His only defense was that he was financially unable to repay the funds he took.  On September 21, 2006, the Court issued an order allowing discovery regarding Kim's ability to pay.  The Court also held that Kim's declaration admitting that he did indeed mishandle frozen assets resulted in waiver of his Fifth Amendment right to testify in this matter.

The SEC and the Receiver deposed Kim on November 1, 2006 to explore his violations further and to find out whether he has the ability to repay the stolen funds.  The SEC and the

Receiver submitted the results of their discovery on November 16, 2006.[1]  The discovery

indicates that for an entire year following the time Kim committed his first violation of the

Preliminary Injunction, he had numerous opportunities and financial means to repay the frozen

assets, but chose not to do so.

From May of 2005 to August of 2005, Kim received $160,000 from the sale of frozen

assets.  Kim admits that he sold the Porsche in or around July or August 2005.  Although he

claims to have spent the $40,000 from the sale on living expenses for himself and his family, he

has failed to submit any documentation of how he spent the money.  Kim also admits that in May

of 2005, he sold his wife's Mercedes SL – 500 for $70,000.  Kim then transferred the proceeds to

an account at Velocity Futures that belonged to his friend and former KL trader, Mr. Q, an

individual identified in the sealed deposition transcript.  Kim states that, within one month, he

had traded away th proceeds from the sale of the Mercedes.  Meanwhile, Mr. Q permitted Kim to

continue treating the account using Mr. Q's money, approximately $100,000.  Kim lost that

money trading as well.

From November 2003 through February 2004, Kim purchased several high-end pieces of

jewelry (diamond earrings, necklace, bracelet and ring) for his wife.  On three separate occasions,

Kim wired a total of more than $100,000 from his personal accounts at Bank of America to the

jeweler.  Although the funds used to purchase the jewelry came from his personal bank account,

KL was the direct and indirect source of all funds in the account.  Kim has admitted to taking the

jewelry from his wife and selling it at a pawn shop in West Palm Beach for $50,000 in May of

2005.  Kim claims to have used the money to pay back debts he owed to his friends.  Kim claims

---

[1]The SEC and the Receiver filed a copy of the deposition under seal.

to have given $40,000 to Mr. Q to repay him for money Kim lost while trading futures with Mr.

Q's money in or around March of 2005.  Kim also claims to have given the remaining $10,000 to

Mr. Y, an individual identified in the deposition transcript, to be placed in Mr. Y's trading

account so Kim could trade at a future date.  Kim states he traded the money in Mr. Y's account

and eventually lost it all around May or June of 2005.  Kim has submitted no objective

documents for trading records to show how these funds were used, however.

From September of 2005 to December 2005, Kim received more than $766,600 from

friends and family members.  In September of 2005, Kim and his wife formed a Delaware limited

liability company called JNL Futures, LLC ("JNL").  Kim's wife was the managing member, but

Kim ran the operation.  By October, at least $384,000 had been deposited into JNL by Kim's

friends and family members.  A portion of those funds came from one of Kim's long-time friends

from Virginia, Mr. X., an individual identified in the deposition.  Mr. X opened a trading account

for Kim at Velocity Futures and funded the account with $300,000.  Kim's parents wired

$199,000 into the JNL account as well.  Kim merged the funds from the Velocity Futures account

with money his parents placed in the JNL account and transferred the money, approximately

$500,000, into a JNL account he had opened at Velocity Futures.  Kim admits that although he

thought about using a portion of those funds to repay the money from selling the Mercedes and

the Porsche, he did not.  When asked why, he replied, "[b]ecause I wanted to make more."

(Depo., 76).

By December, Mr. X wired an additional $150,000 into the JNL bank account.  He also

provided Kim with $17,600 via two separate counter-deposits of $8,500 and $9,100 on

December 1 and 27, 2005,  respectively.  According to Kim, these funds were needed to cover

7

expenses relating to an office Kim had set up for JNL in Tyson,Virginia.  Bank records also show that on December 29, 2005, Mr. Q wired $100,000 into JNL's bank account at Wachovia. According to Kim, this money was for repayment of the loan Kim had made to Mr. Q.  When asked why he lent Mr. Q $100,000 instead of using the money to replace the frozen assets, Kim replied that Mr. Q had helped him out in the past and that he was now in a position to help Mr. Q.

In January 2006, Kim received $383,000 from the sale of the Korean Property and purportedly earned an additional $330,000 in profit from his trading activities.  The Court has already noted that Kim improperly disposed of the sale proceeds of the Korean Property.  In reality, Kim directed his wife to transfer the funds out of her account and into the JNL account at Wachovia.

Kim claims to have earned approximately $330,000 by trading the proceeds from the Korean Property.  Instead of using these monies to repay the frozen assets, Kim withdrew $70,000 of this money and used it for a down payment on a new home in Houston, Texas.  Kim claims he ultimately lost the remaining profits along with the initial proceeds from the Korean Property sale through trading.

From February 1, 2006 to May 31, 2006, Kim continued to receive financial assistance from family members and friends and used it for his own trading ventures.  Bank records showed that during this period, family and friends transferred at least $496,400 into JNL's account. Although Kim maintains these funds were ultimately lost in trading, he offers no evidence in support of this claim.

## II. <u>DISCUSSION</u>

Once a violation of a court order is established by clear and convincing evidence, the alleged contemnor may assert the defense of inability to pay.  This defense is available only to those who show "all reasonable avenues for raising funds have been explored and exhausted." <u>Piambino v. Bestline Products, Inc.</u>, 645 F. Supp. 1210, 1215 (S. D. Fla. 1986) (quotation omitted).  <u>See</u> <u>also</u> <u>Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.</u>, 950 F.2d 1525, 1529 (11th Cir.1992) (contemnor asserting inability must establish he has made in good faith all reasonable efforts to meet the terms of the court's order) (quotation omitted); <u>Huber v. Marine Midland Bank</u>, 51 F.3d 5, 10 (2d Cir. 1995) (noting that the contemnor bears the burden of showing "clearly, plainly and unmistakably" that compliance is impossible).  The availability of this defense must be assessed at the time of the contempt proceedings.  <u>Piambino</u>, 645 F. Supp. at 1215.

The Eleventh Circuit has consistently held that the mere assertion of present inability to pay or comply with the court order is insufficient to avoid civil contempt.  <u>See</u> <u>Chairs v. Burgess</u>, 143 F.3d 1432, 1436 (11th Cir. 1998) (to satisfy present inability defense to contempt, party must "offer proof beyond mere assertion of inability") (quoting <u>Citronelle-Mobile Gathering, Inc. v.</u> <u>Watkins</u>, 943 F.2d 1297, 1301 (11th Cir. 1991); <u>In re Shore</u>, 193 B.R. 598, 602 (S.D.N.Y. 1996) (court properly determined debtor failed to establish present inability to pay to purchase contempt or debtors only of evidence of inability with his own unsupported testimony).  Simply stated, "where contemner alleges an inability to pay, such inability cannot save him from being found in contempt when contemner created the inability himself." <u>Piambino</u>, 645 F. Supp. at 1215.

Kim's inability to pay is unquestionably self-induced.  He may not use his repeated

defiance of the Preliminary Injunction to render the Court's orders meaningless.  Kim's tactics

essentially endorse violating asset freeze orders, disbursing of money as much as possible, and

then pleading "inability to pay" if anyone caught him.

Kim has fallen far short of meeting his burden to establish compliance with the

Preliminary Injunction order by returning the frozen assets he misappropriated.  Kim has

provided no records of his assets or of how he spent the proceeds he received from May 2005 to

May 2006.  Accordingly, he fails to meet the substantial burden he carries in proving his defense.

See Citronelle, 943 F.2d at 1301 (contempt defendant must prove beyond mere assertion of

inability and must introduce evidence supporting his claim).  He has submitted no documents,

records, or bank statements accounting for all the money he obtained.  These omissions are

critical to the determination of Kim's credibility and his present ability to repay the frozen assets.

 United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988) (evasive, incomplete testimony will

not satisfy the defense of impossibility).  Kim's failure to disclose this information leaves open

the possibility that he may still have access to funds to repay the assets he liquidated.

Kim also failed to make all good faith reasonable efforts to comply with the Court's order

by replacing the frozen funds.  He claims to have asked his parents, sister, friends, and even KL

investors for assistance in repaying the stolen funds.  According to Kim, they all refused.  Kim

offers no affidavit from anyone in support of this contention.

Kim has made no real effort to replace the frozen assets he took, much less any effort that

meets the standard for the inability to pay defense.  The Court has the authority to incarcerate

Kim for his failure to pay the misappropriated assets.  Wellington, 950 F.2d at 1526, 1529

(permitting an incarceration of 18 months as a remedy for civil contempt where contemnor failed

to prove inability to repay disgorged funds amounting to $2.8 million).  The Court hereby rejects Kim's purported defense of inability to pay based on: (1) his failure to support the defense; (2) his failure to demonstrate that he has made all reasonable good-faith effort to comply by replacing the money he took; and (3) because his inability to pay was self-created.

The Court hereby orders the immediate incarceration of John Kim until he purges his contempt either by paying the funds or by proving, categorically and in detail, his inability to do so despite all good-faith efforts, including providing an accurate accounting of those proceeds he received and misappropriated.  The Court will issue a bench warrant for John Kim's arrest separately.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 27th day of November, 2006.

Copies provided:                   S/Kenneth L. Ryskamp
all parties and counsel of record     KENNETH L. RYSKAMP
                                   UNITED STATES DISTRICT JUDGE